Isaac FULWOOD, Jr., Appellant,

v.

Quentin PORTER, et al., Appellees.

No. 92–CV–888.

District of Columbia Court of Appeals.

Argued Feb. 2, 1994.

Decided March 28, 1994.

against the District of Columbia, Isaac Fulwood, Jr., then Chief of the Metropolitan Police Department (MPD), and two MPD officers, Benavidez and Lambert. The case originated in the arrest of Mr. Porter on April 9, 1990, for disorderly conduct; his arm was allegedly broken during the arrest. This interlocutory appeal by Chief Fulwood, which presents solely the issue of whether he is immune from liability under *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), relates to appellees' claim under 42 U.S.C. § 1983 that, "through improper training and supervision of his police force, and through indifference to a widespread pattern of police brutality and unlawful arrest among his police force, [Chief Fulwood] caused the assault and injury of Mr. Porter." The trial judge denied Fulwood's motion to dismiss or for summary judgment on this claim based upon the defense of qualified immunity.[1] We hold that, since appellees have failed to demonstrate a triable issue of fact as to whether Fulwood "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known," *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738; *Durso, supra* note 1, 624 A.2d at 453, Fulwood should have been granted summary judgment. We therefore reverse.

## I.

Mr. Porter was arrested on April 9, 1990, at the corner of 14th and P Streets, N.W. Officers Benavidez and Lambert had responded to a complaint of public drinking at a nearby bus stop. Porter alleged in his complaint that when the officers arrived, they demanded to know who owned a cup that lay near him; he denied possessing it. Benavidez refused Porter's offer of identification and ushered him to a police cruiser, then grabbed him and twisted his arm while swinging him against the car. Porter's arm broke with an audible crack. Benavidez then handcuffed him and placed him in the police car. Porter denied that he had engaged in

Edward E. Schwab, Asst. Corp. Counsel, with whom John Payton, Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, were on the brief, for appellant.

James R. Klimaski, with whom Lynn I. Miller and Thomas Ragland were on the brief, for appellees.

Before FERREN, STEADMAN, and FARRELL, Associate Judges.

FARRELL, Associate Judge:

Appellees Quentin Porter and his wife, Georgianna Porter, filed this suit

1. That order is appealable under the "collateral order doctrine." *Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985); *Durso v. Taylor,* 624 A.2d 449, 451 n. 1 (D.C.1993).

any illegal activity or aggressive behavior at the time of his arrest.[2]

On March 22, 1991, appellees filed a multi-count complaint against the District of Columbia, Chief Fulwood, Officers Benavidez and Lambert, and D.C. General Hospital (this count arising from alleged post-arrest injuries). Later amended, the complaint alleged—as relevant here—that Fulwood in his capacity as Chief of the MPD "knew or had reason to know that officers of the [MPD] were engaged in a widespread and persistent pattern of using excessive force against individuals, unlawfully arresting and detaining individuals and otherwise abusing their authority as police officers"; that the "outrageous misconduct by the officers shows that their training and supervision by Chief Fulwood and the [MPD] has been grossly inadequate"; that "[b]y failing to act to correct this widespread and persistent practice among [MPD] officers, Chief Fulwood ... followed a policy of deliberate indifference and reckless disregard for the constitutional rights of persons within the District of Columbia"; and that as a result of this "policy and failure to act, Mr. Porter has been severely injured, in violation of the United States Constitution...."

Fulwood moved to dismiss on October 2, 1991, without, however, mentioning appellees' claim under 42 U.S.C. § 1983. Judge Kollar–Kotelly dismissed a separate count alleging negligent training on Fulwood's part,[3] but recognized that this dismissal "does not affect plaintiffs' claim under § 1983." Fulwood then moved either to dismiss the complaint or for summary judgment on the § 1983 count. He argued that under *Harlow v. Fitzgerald, supra,* he was entitled to qualified immunity and that appellees had failed to "meet a heightened standard of specificity" in their complaint as required for § 1983 claims against public officials. To a similar motion filed later on behalf of all defendants, including Fulwood, the District government attached additional materials, *viz.,* a syllabus of the police academy training program for MPD officers; a portion of Mr. Porter's responses to interrogatories; and a portion of Porter's and his wife's depositions. Appellees opposed Fulwood's motion, asserting first that they had met any "heightened pleading" standard and that Fulwood had waived the defense of qualified immunity by not pleading it in his answer.[4] Appellees also attached five exhibits to their opposition: (1) a list of court judgments entered against the District of Columbia from 1987–1991 for § 1983 claims or alleged torts by MPD officers; (2) a list of pending suits alleging misconduct by MPD officers; (3) Mr. Porter's answers to interrogatories; (4) a written opinion of appellees' proposed expert witness that Porter's arrest involved the use of improper police procedures and excessive force, and reflected a lack of training and supervision of the officers involved; and (5) a press release describing the results of a survey of members of the D.C. Fraternal Order of Police concerning, *inter alia,* the adequacy of their training. Appellees later submitted, in addition, a 1990 U.S. General Accounting Office study of the MPD academy training program which, in appellees' words, "show[ed] a considerable inconsistency in the education of new police officers."[5] Chief Fulwood re-

---

2. Chief Fulwood's version of the arrest, as stated in the deposition of Officer Benavidez, was that when the two officers arrived at the scene they saw a cup and a brown bag containing a bottle of whiskey near Porter. The cup with liquor spilled, and when Benavidez emptied the whiskey bottle on the ground, Porter cursed at him. Benavidez determined that Porter had been drinking. Mrs. Porter, who was present, asked the officer not to arrest her husband, but as she began escorting him away, Mr. Porter broke *from her grasp and moved toward* Benavidez, waving his hands. Benavidez arrested him for disorderly conduct.

3. The judge concluded that Fulwood was absolutely immune from suit in tort, an issue not before us in this interlocutory appeal before judgment.

4. Fulwood sought to rectify this omission by seeking leave to amend his answer, a motion the trial judge ultimately granted.

5. Appellees submitted as well newspaper articles describing the delay in the processing of civilian complaints of police misconduct by the Civilian Complaint Review Board, and an interrogatory answer in unrelated litigation in which the District admitted that it was not aware of any studies done to determine the extent to which MPD police used excessive force or improperly stopped or arrested citizens.

sponded with an affidavit summarizing MPD arrest policy and the training received by MPD officers in matters such as use of unnecessary force. He pointed out that he had become Chief of Police on August 1, 1989, slightly more than eight months before the arrest in this case, and acknowledged that one of his responsibilities as Chief was "to order and direct instruction and training for [MPD] members."

On July 21, 1992, Judge Kollar–Kotelly denied Fulwood's motion to dismiss or for summary judgment. She concluded, *inter alia,* that appellees had "provided a list of previous lawsuits which, in conjunction with the [FOP] survey of police officers regarding training, raises a factual dispute as to whether or not defendant had notice of the alleged [widespread pattern of] incidents of misconduct." She rejected Fulwood's reliance both on departmental (and statutory) prohibitions on use of excessive force and on the training afforded officers as set forth in the police academy syllabus, explaining:

> Notably absent from this list [*i.e.,* the District's enumeration of training areas] is any program on the use of excessive force. Also absent are affidavits as to whether or not such training on the use of excessive force is provided under the title of some other area. Provisions prohibiting the use of excessive force do not address whether or not the police officers received any training.

In short, the judge concluded that appellees, through their complaint and supporting documents, had created triable issues of fact on whether "the need for more or different training [was] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city [including Fulwood] can reasonably be said to have been deliberately indifferent to the need," quoting *City of Canton v. Harris,* 489 U.S. 378, 390, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989).

## II.

■ "[G]overnment officials performing discretionary functions"—a class of which Chief Fulwood is concededly a member—

"generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. This standard "is intended to provide government officials with the ability 'reasonably [to] anticipate when their conduct may give rise to liability for damages.'" *Anderson v. Creighton,* 483 U.S. 635, 646, 107 S.Ct. 3034, 3042, 97 L.Ed.2d 523 (1987) (quoting *Davis v. Scherer,* 468 U.S. 183, 195, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984)). More particularly, it is designed "to 'permit the resolution of many insubstantial [damage] claims on summary judgment' and to avoid 'subject[ing] government officials either to the costs of trial or to the burdens of broad-reaching discovery' in cases where the legal norms the officials are alleged to have violated were not clearly established at the time." *Mitchell, supra* note 1, 472 U.S. at 526, 105 S.Ct. at 2815 (quoting *Harlow,* 457 U.S. at 817–18, 102 S.Ct. at 2737–38).

■ In keeping with this purpose, Chief Fulwood first argues that this court should adopt a "heightened pleading standard" where qualified immunity is likely to be imposed as a defense. Under this standard, as articulated by the United States Court of Appeals for the District of Columbia Circuit, plaintiffs alleging conduct by a government official performing a discretionary function "generally must put forward, in their complaints or other supporting materials, greater factual specificity and 'particularity' than is usually required." *Martin v. Malhoyt,* 265 U.S.App.D.C. 89, 109, 830 F.2d 237, 257 (1987). Recently, however, the Supreme Court has thrown a cloud over the continued viability of this doctrine even as applied to the qualified immunity defense. In *Leatherman v. Tarrant County Narcotics Unit,* —— U.S. ——, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), the Court rejected a heightened pleading requirement in cases alleging *municipal* liability under 42 U.S.C. § 1983, finding it inconsistent "with the liberal system of 'notice pleading' set up by the Federal Rules [of Civil Procedure]." *Id.* at ——, 113 S.Ct.

at 1163.[6] Although the Court had "no occasion to consider whether our qualified immunity jurisprudence would require a heightened pleading in cases involving *individual* government officials," *id.* at ——, 113 S.Ct. at 1162 (emphasis added), its reasoning leaves room for considerable skepticism about the validity of the doctrine even in immunity cases. *See, e.g., Branch v. Tunnel,* 14 F.3d 449, 455 (9th Cir.1994); *Kimberlin v. Quinlan,* 303 U.S.App.D.C. 330, 340, 6 F.3d 789, 799 (1993) (Edwards, J., dissenting).

Fortunately, we need not decide whether this court should, or permissibly could,[7] adopt a heightened pleading requirement in § 1983 cases. The purpose of such a rule is to spare the official the burden of protracted discovery, *e.g., Martin,* 265 U.S.App.D.C. at 109, 830 F.2d at 257; yet Chief Fulwood has undergone extensive discovery already because of his failure to plead qualified immunity on the § 1983 count until he asked leave to amend his answer while moving to dismiss or for summary judgment on immunity grounds. Moreover, both Fulwood and appellees filed exhibits in connection with the District's later motion to dismiss on his behalf. Judge Kollar–Kotelly was therefore required to treat Fulwood's motion as one for summary judgment. *E.g., American Ins. Co. v. Smith,* 472 A.2d 872, 874 (D.C.1984) ("If any matters outside the complaint are presented to the court, then the rule [Rule 12(b)(6)] requires that the motion be treated as one for summary judgment and disposed of as provided in Super.Ct.Civ.R. 56").

In short, the case had proceeded well beyond the pleading stage by the time Fulwood ever asserted the requirement of a heightened pleading. In any event, our disposition of the summary judgment issue, to which we now turn, makes it doubly unnecessary for us to assess appellees' complaint against such a standard. We readily agree, however, that our evaluation of the evidence proffered in opposition to the motion for summary judgment may—indeed, should—reflect the rigor of an immunity standard designed to "permit the defeat of insubstantial claims without resort to trial." *Harlow,* 457 U.S. at 813, 102 S.Ct. at 2736.

### III.

As explained above, "whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson,* 483 U.S. at 639, 107 S.Ct. at 3038 (citations omitted). Consequently, as our Circuit Court stated in *Martin, supra* (per Judge Ruth Bader Ginsburg):

> A motion for summary judgment on the issue of the defendant's qualified immunity ... must be denied where, viewing the facts in the record and all reasonable inferences derived therefrom in a light most favorable to the plaintiff, a reasonable jury could conclude that the unlawfulness of defendant's actions was so "apparent" that no reasonable officer could have believed in the lawfulness of his actions.

265 U.S.App.D.C. at 105–06, 830 F.2d at 253–54 (quoting *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039). The converse must equally be true: *unless* a reasonable jury could conclude that the unlawfulness is "apparent" to the degree indicated, summary judgment must be granted.[8] But what "actions" of

---

6. The Court pointed out, *inter alia,* that

> the Federal Rules do address in Rule 9(b) the question of the need for greater particularity in pleading certain actions, but do not include among the enumerated actions any reference to complaints alleging municipal liability under § 1983. *Expressio unius est exclusio alterius.*

—— U.S. at ——, 113 S.Ct. at 1163.

7. Although *Leatherman* was based upon a reading of Rules 8(a)(2) and 9(b) of the Federal Rules of Civil Procedure, their similarity in language to the corresponding Superior Court rules makes *Leatherman* authoritative in construing our local rules. *See Jackson v. District of Columbia,* 412 A.2d 948, 951 n. 4 (D.C.1980).

8. The answer to the question whether the trial court or a jury ultimately decides the issue of qualified immunity is suggested by the Supreme Court's allusion in *Mitchell, supra,* to the situation where a trial judge denies a motion to dismiss or for summary judgment after concluding that, "if the facts are as asserted by the plaintiff, the defendant is not immune." 472 U.S. at 527, 105 S.Ct. at 2816. That is, disputed factual issues relevant to the immunity issue are, as in

Chief Fulwood are in dispute here? Fulwood concededly had no personal involvement in the arrest of Mr. Porter. Thus, as appellees recognize, it is not enough to assert merely that Porter's right to be free of an unlawful arrest and the use of excessive force was "clearly established." [9] Instead, appellees contend that Fulwood's failure "to supervise, train, discipline or otherwise take steps to control" the behavior of MPD police officers was so extreme as to meet the "deliberate indifference" standard of *City of Canton v. Harris, supra,* which we must pause to examine.

▪ In *Monell v. New York City Dep't of Social Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court rejected liability for municipalities and municipal officials under 42 U.S.C. § 1983 based upon *respondeat superior. Monell* makes a municipality liable only where it *"itself* causes the constitutional violation at issue." *Harris,* 489 U.S. at 385, 109 S.Ct. at 1203 (emphasis in original).[10] In *Harris,* the Court refined this causation in addressing a claim that the City of Canton had failed to train its police force to recognize when medical treatment of detainees was necessary. The Court rejected the view that "failure to train" liability could rest upon negligence, even gross negligence, or recklessness. *Id.* at 382, 109 S.Ct. at 1201 (quoting test erroneously applied by the trial court). Rather,

> the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom police come into contact....

any other case, submitted to the trier of fact, but the "purely legal question on which [the] claim of immunity turns," *id.* at 530, 105 S.Ct. at 2817, remains for the court to decide.

**9.** Even in a suit against an arresting officer who then claims immunity, an assertion this general would probably not suffice under *Anderson, supra;* the question, rather, would be whether, under the particular facts and circumstances presented, a reasonable officer should have known that in making an arrest or employing a certain amount of force, he was violating "clearly established" rights of the defendant. *See* 483 U.S. at 641, 107 S.Ct. at 3040.

Only where a failure to train reflects a "deliberate" or "conscious" choice by a municipality—a "policy" as defined by our prior cases—can a city be liable for such a failure under § 1983.

*Id.* at 388–89, 109 S.Ct. at 1204–05. Though the notion of a "policy" not to train seems incongruous, such liability could arise, the Court explained, when "in light of the duties assigned to specific officers ... the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390, 109 S.Ct. at 1205.[11]

Two points are immediately apparent. First, the question before us of whether Chief Fulwood violated clearly established rights of which he should have known—the immunity issue—and the question whether he exhibited deliberate indifference to the violation of constitutional rights by street-level officers—the liability issue—are effectively the same. *See, e.g., Anderson v. Roberts,* 823 F.2d 235, 238 (8th Cir.1987) ("clearly established law" for immunity purposes is supervisor's duty in the particular circumstances to train adequately). While this appears at odds with the Supreme Court's emphasis in *Mitchell v. Forsyth, supra,* on the separateness of the immunity and merits issues, *see* 472 U.S. at 529 n. 10, 105 S.Ct. at 2817 n. 10, no other analysis makes sense in the "failure to act" context, where we view Fulwood's entitlement to immunity through the prism, as it were, of the deliberate indifference standard of *Harris.*[12]

**10.** The same is true of municipal officers acting in their official capacity. *Monell,* 436 U.S. at 690 n. 55, 98 S.Ct. at 2035 n. 55.

**11.** In addition to meeting this standard, the plaintiff must demonstrate

> that the deficiency in training actually caused the police officers' indifference to [the plaintiff's rights]. Would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?

489 U.S. at 391, 109 S.Ct. at 1206 (footnote omitted).

**12.** Nor is this situation unique. *See, e.g., Hopkins v. Andaya,* 958 F.2d 881, 885 n. 3 (9th Cir.1992) (pointing out that in unreasonable

Second, this identity of issues is important to the question of who bears the burden of proof on immunity, an issue the parties here dispute and which in turn affects our summary judgment analysis. For, as the Supreme Court has explained, Rule 56(c) "mandates the entry of summary judgment, after adequate discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).[13] Because appellees would have the burden at trial of proving deliberate indifference by Fulwood, they necessarily have the burden of proving that he violated clearly established rights *by* a failure to train rising to that exacting level. *See Martin, supra,* 265 U.S.App.D.C. at 106, 107–08 & n. 49, 830 F.2d at 254, 255–56 & n. 49 (in case where plaintiffs alleged, *inter alia,* that Chief of United States Park Police had "either affirmatively permitted [the] practice of arrest of persons without probable cause or [had] failed to establish … procedures adequate to assure that persons are not improperly arrested and assaulted," plaintiffs would bear burden of proving existence of this policy at trial, which in turn affected showing they were required to make in opposing summary judgment for Chief on ground of qualified immunity).[14]

Mindful then of appellees' obligation to prove that "the need for more or different training [of MPD officers in regard to arrests was] so obvious, and the inadequacy so likely to result in the violation of constitutional rights" as to amount to deliberate indifference on Fulwood's part, *Harris,* 489 U.S. at 390, 109 S.Ct. at 1205, we proceed to consider the adequacy of their showing in opposition to the motion for summary judgment.

## IV.

Appellees agree that to establish a failure to supervise and train by Fulwood amounting to a "policy" of indifference, there must be evidence from which a trier of fact could find a widespread pattern of misconduct by subordinate officers which he reasonably may be said to have disregarded.[15] *E.g., Carter v. District of Columbia,* 254 U.S.App.D.C. 71, 80, 795 F.2d 116, 125 (1986) ("to establish municipal liability under § 1983, it was plaintiffs' burden to show a 'persistent, pervasive practice' of the city officials and Police Chief"); *Spell v. McDaniel,* 824 F.2d 1380, 1390 (4th Cir.1987) ("[i]f these unconstitutional practices become sufficiently widespread … they may assume the quality of 'custom or usage' [under] § 1983"); *Bordanaro v. McLeod,* 871 F.2d 1151, 1157 (1st Cir.1989) ("Constructive knowledge 'may be evidenced by the fact that the practices have been so widespread or flagrant that in the proper exercise of [their] official responsibilities the [municipal policymakers] should have known of them'"); *Kerr v. City of West Palm Beach,* 875 F.2d 1546, 1556 (11th Cir. 1989) (reasonable jury could find that "the unconstitutional character of many of the [police] canine unit's apprehensions was plainly obvious to City officials, who then deliberately chose not to take corrective action"). Indeed, that is just what appellees

---

force suits against the actual arresting officers, "unlike in other cases," the qualified immunity and merits issues merge because the officer's entitlement to immunity depends on whether the circumstances would have allowed a reasonable officer to conclude that the seizure was lawful).

**13.** This in turn is explained by the fact that the standard for resolving motions for summary judgment "mirrors the standard for a directed verdict under [Fed.R.Civ.P.] 50(a)." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). *See Hill v. White,* 589 A.2d 918, 921 n. 8 (D.C.1991).

**14.** That appellees bear the burden of proof as described, of course, does not alter the rule that qualified immunity is an affirmative defense which the official must plead. *Harlow,* 457 U.S. at 815, 102 S.Ct. at 2736.

**15.** No contention is made that Fulwood had knowledge (actual or constructive) of prior misconduct by the particular officers involved, Benavidez and Lambert, which he chose to ignore. Compare, in this respect, *Hopkins, supra* note 12, 958 F.2d at 888 ("Andaya has a history of citizen complaints of excessive force, a reputation for being quick-tempered, and has drawn or fired his gun inappropriately several times before. These facts would certainly bear on whether the city properly trained Andaya….").

alleged, *i.e.*, that Fulwood failed to supervise and train his officers adequately despite actual or constructive knowledge of "a widespread pattern of police brutality and unlawful arrest among his police force...."

In his affidavit, Chief Fulwood described the training received by MPD officers in the law of arrests and the proper use of force both in their initial police schooling and in refresher programs. He explained, for example, that "[a]t my direction officers of the [MPD] are instructed, on a continuing basis, that they may use only such force as appears reasonably necessary under the circumstances to effect and maintain an arrest...." The accompanying syllabus of the academy training program described the approximately 24 weeks of training received by new officers on subjects that include "the U.S. Constitution, D.C.Code, Municipal Regulations, Manual of MPD, Department General Orders, laws of arrest, search and seizure, use of force,[16] use of firearms and other department weapons, self-defense and physical control techniques." Officers also undergo refresher training in all of these areas. According to Fulwood, "[t]his training consists of 120 hours of instruction and is offered a minimum of 12 times a year.... Officers are reinstructed in various aspects of their police duties and responsibilities including the use of force in the apprehension of suspects and maintaining an arrest." Fulwood added that "[i]t is my policy that members shall report each instance of their use of force to a superior officer as soon as possible," and that "each instance of force ... be reviewed by a superior officer, and in instances where deadly force was used, that it be investigated by the department and referred to the office of the United States Attorney...."

■ Appellees responded to these representations by citing what they termed "a profusion of lawsuits" against the District in recent years alleging common-law or constitutional torts by MPD officers and seeking damages from the District. They submitted a list of 34 cases in which judgments were entered against the District of Columbia between 1987 and 1991 and a list of 237 pending "Police False Arrest and Assault" suits brought against the District over a similar two and a half year period. In addition, they submitted the statement of their expert witness and the press release and GAO report cited earlier. We consider each of these items in turn.

The lists of judgments won and suits pending against the District fall well short of creating a triable issue on Fulwood's liability (and, *a fortiori*, his qualified immunity). The lists constitute at best raw numerical data which appellees proffered without any accompanying affidavit or statement of an expert attributing the suits or judgments to a failure to train and supervise. No evidence was offered, first of all, comparing these statistics to similar records of suits and judgments involving other police departments similar in size and annual number of arrests to the MPD.[17] That alone is not decisive (in theory, at least, those other jurisdictions might also be deficient in training), but it highlights appellees' failure to offer any proof enabling a factfinder to conclude that an average of seven judgments and approximately ninety-six suits annually against a police force as large as the District's demonstrated negligent training and supervision, still more the "policy or custom" of "deliberate indifference" necessary to hold Chief Fulwood liable.

Courts have recognized the appropriateness and importance of expert testimony in § 1983 cases, particularly those claiming a

**16.** Although Judge Kollar–Kotelly found that the syllabus did not include training in the avoidance of excessive force, in fact a one-hour block of instruction entitled "failed to make arrest, use of unnecessary force" appears in the list entitled "D.C.Code Part Two" (the Code reference is perhaps to D.C.Code § 4–176 (1988), prohibiting unnecessary force). Twenty-eight additional hours are devoted to subjects such as "stop and frisk," "probable cause," and "search and seizure." Moreover, Fulwood's affidavit averred

that both the recruit training and refresher training included the subject of excessive force.

**17.** According to the 1991 Crime and Justice Report for the District of Columbia (D.C. Office of Grants Management and Development) for example, in 1991 the MPD had 4,526 police officers, and between 1987 and 1991 annual arrests totalled an average of some 44,000.

failure to train, *Russo v. City of Cincinnati*, 953 F.2d 1036, 1047 (6th Cir.1992), and relying on statistical evidence. *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1051–52, 1075 (3d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1671, 118 L.Ed.2d 391 (1992). There can, of course, be no general requirement for such testimony, but appellees' statistics simply tell us nothing about Chief Fulwood's fault without the elucidation of expert opinion. The statement in the record of appellees' designated expert, Robert W. Klotz, does not purport to rely on or explain these statistics; it states his opinion only that "[t]he entire situation of April 9, 1990 [*i.e.*, Mr. Porter's arrest] reflects a lack of training[ ] and supervision of the involved officers." It thus fails to provide a matrix within which inferences about Fulwood's culpability can reasonably be drawn from the numerical data alone.

This is all the more true when we consider that Fulwood took office only eight months before Porter's arrest. Only a tiny handful of the judgments cited by appellees were rendered during this period. The mere unilluminated fact of these judgments, and of some sixty suits filed during the same period, is insufficient to establish the notice and consequent deliberate indifference that *Harris* requires.[18] Indeed, given the brief period of time in question, it is speculative whether the improvements in training appellees claim Fulwood should have ordered could even have been implemented and affected the conduct of line officers by the time of Porter's arrest. *See Harris*, 489 U.S. at 391, 109 S.Ct. at 1206 (plaintiff must prove that deficiency in training for which defendant is responsible "actually caused" violation of rights alleged). We reject appellees' rejoinder that Fulwood's *former* position as Assistant Chief of Police lengthens the relevant period of constructive notice to him. Appellees sued Fulwood in his capacity as Chief of Police, responsible for policy and ultimate supervision; we can only guess whether his previous duties should have alerted him to the need to reform training on the use of force as one of his very first priorities on becoming Chief.[19]

 The remaining documents which appellees submitted do nothing to strengthen their case. The Fraternal Order of Police press release stated the results of a purported survey of roughly 20% of that group's members, three-fourths of whom (*i.e.*, of this 20%) answered "no" to questions whether police academy and in-service training was "adequate." Aside from the meagerness and informality of this sample, the claimed inadequacy in training is not further identified and could not reasonably inform a policymaker such as Fulwood of specific shortcomings in training on the law of arrests. *See Harris*, 489 U.S. at 391, 109 S.Ct. at 1206 ("for liability to attach in this circumstance *the identified deficiency* in a city's training program *must be closely related to* the ultimate injury" (emphasis added)). Even less so does the GAO study reporting "frequent changes" and "past lack of documentation in [police] recruit-training" demonstrate a conscious indifference by Chief Fulwood toward a practice of unlawful arrests. Finally, we reject appellees' claim that an alleged or even documented pattern of delay by the District of Columbia Civilian Complaint Review Board (CCRB) in processing complaints of police misconduct, *see Cox v. District of Columbia*, 821 F.Supp. 1 (D.D.C.1993), appeal filed, No. 93–7103 (D.C.Cir. June 10, 1993), is relevant to Fulwood's individual liability. The CCRB was created as an inde-

---

18. In *Fiacco v. City of Rensselaer, New York*, 783 F.2d 319 (2d Cir.1986), cited by appellees, the court opined that "the very assertion of a number of . . . claims [of excessive force] put the City on notice that there was a possibility that its police officers had used excessive force." *Id.* at 328. In *Fiacco*, however, there was much more than a "possibility"—there was abundant evidence supporting imputation of knowledge of the misconduct to the city officials. As the D.C. Circuit has characterized *Fiacco*, it presented a "concentrated, fully packed, precisely delineated scenario[ ]" of misconduct, featuring "a parade of witnesses, each an excessive force complainant before the police chief himself, each relating first hand and in detail both the brutal incident and the chief's stock response." *Carter*, 254 U.S.App.D.C. at 80, 795 F.2d at 125. No showing even remotely like that in *Fiacco* has been made here.

19. Even appellees' statistics concerning judgments and lawsuits do not cover 1985 and 1986, when Fulwood was Assistant Chief.

pendent adjudicatory body by act of the Council of the District of Columbia. *See* D.C.Code § 4–901 (1988). The act expressly forbids the Chief of Police "from maintaining any system other than that set forth [herein] for the processing of ... civilian complaints against [MPD] officers...." § 4–909(c). We can find no basis for attributing defects in the CCRB's procedures for resolution of complaints to Fulwood in his capacity as Chief.

In sum, under the exacting substantive standard for liability of *Harris, supra,* appellees have failed to demonstrate that a reasonable trier of fact "could conclude that the unlawfulness of [Chief Fulwood's] action was so 'apparent' that no reasonable [official in his position] could have believed in the lawfulness of his actions." *Martin,* 265 U.S.App.D.C. at 106, 830 F.2d at 254. Accordingly, Fulwood's defense of qualified immunity should have been sustained.

*Reversed.*