DISTRICT OF COLUMBIA, et al., Appellants/Cross–Appellees,

v.

Felicia JACKSON, Appellee/Cross–Appellant.

No. 99–CV–756, 99–CV–972.

District of Columbia Court of Appeals.

Argued Sept. 24, 2002.
Decided Nov. 14, 2002.

James C. McKay, Jr., Senior Assistant Corporation Counsel, with whom Robert R. Rigsby, Corporation Counsel at the time, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for appellants/cross-appellees.

Gregory L. Lattimer, Washington, DC, for appellee/cross-appellant.

Before WAGNER, Chief Judge, and FARRELL and REID, Associate Judges.

FARRELL, Associate Judge:

Terrence Hicks was shot to death by police officers who had responded to the home of his mother and found him holding her hostage at knifepoint. In subsequent wrongful death and survival actions brought against the District of Columbia and individual police officers by the estates of Hicks and his mother (who died of natural causes before trial),[1] liability turned essentially on whether the officers had used excessive force to immobilize Hicks—ultimately by killing him—after they saw him wield the knife as though about to stab his mother in the chest. The jury found in favor of Hicks's estate as to the District, acting through three police officers, on each of three counts: violation of Hicks's Fourth Amendment rights under 42 U.S.C. § 1983, assault and battery, and negligence *per se*.[2] The jury awarded the plaintiff $2,149,998 in compensatory damages and $3,999,000 in punitive damages, both apportioned equally among the three officer-defendants. On a post-trial motion by the District, the trial judge remitted the compensatory damages to a total of $180,000,[3] but otherwise left the

jury verdicts intact. On appeal, the District assigns error with respect to each count on liability and contests any award of punitive damages in this case. On cross-appeal, the plaintiff challenges the decision to remit the compensatory damages.

We hold that the evidence fairly permitted the jury to find, over the officers' defense of qualified privilege, that they committed assault and battery against Hicks by engaging in the use of excessive force. That being so, we find it unnecessary to resolve the District's claims challenging the separate verdicts for the § 1983 violation and negligence because the jury returned a single award of compensatory damages, and because we further hold that no award of punitive damages was legally permissible in the circumstances of this case. Finally, we sustain as a proper exercise of discretion the trial judge's decision to remit the compensatory damages.

### I.

On August 16, 1994, Metropolitan Police officers were alerted to the fact that Terrence Hicks was at the home of his mother, Mary Haley, threatening to kill her with a knife unless his former girlfriend, Kimberly Johnson, was brought to see him.[4] The police went to Haley's residence in an apartment building and, standing outside the door, held repeated conversations with Hicks in which he refused to open the door and threatened to kill his mother. Hicks had told the police he

---

1. The plaintiff was Felicia Jackson, the sister of Hicks and the daughter of his mother, Mary Haley.

2. The jury found against the estate of the mother on all counts.

3. The plaintiff received the option of a new trial on damages, which she declined.

4. The police received information that Hicks had earlier kidnapped and sexually assaulted Johnson.

would "shoot" his mother. When they spoke with Mrs. Haley, she stated that he did not have a gun but had a knife and was restraining her physically. Negotiations continued for more than an hour during which Hicks gave differing "time lines" as to when he would kill Mrs. Haley with the knife unless Johnson was brought to see him. To the police he sounded "angry, almost irrational." Eventually a decision was made for the Emergency Response Team (ERT) to force entry into the apartment.

The plan was for the ERT, consisting of Sergeant Jackson (in charge), Lieutenant Durham, and Officers DeSantis, Henderson, Stewart, and Powell to enter the apartment and rescue Mrs. Haley without causing loss of life if possible. At a point when Hicks had effectively "broke[n] off all negotiations," the team members forced the apartment door open and entered, each armed. According to their uniform testimony, they saw Mrs. Haley seated and appellant crouching behind her with his left arm around her neck and a knife in his right hand. They ordered him several times to drop the knife. But when Hicks rubbed the knife across Mrs. Haley's chest and then raised it as if to stab her there, DeSantis fired a shot which cut off two of her fingers, grazed her ear, and struck Hicks on the chin or left side of his face, though not fatally. DeSantis fired a second shot as Hicks "was spinning down to the ground." Officers testified that Hicks "[i]mmediately came back up" or "jumped back up," and three officers began firing their weapons at him. As Durham and DeSantis pulled Mrs. Ha-

ley all the way or partly into the adjoining kitchen, Henderson, Stewart and Powell fired a total of some twenty-one shots at Hicks from a distance of nine feet or closer. Thirteen bullets struck Hicks, approximately seven of them in the back; two shots, including one to the left back of the head, were "very likely" fatal, and others were possibly so.

At trial, the plaintiff's theory in substantial part was that Hicks had never threatened his mother with a knife—in effect that the police had fabricated the claim of an immediate threat to her safety or their own.[5] The jury rejected this theory by exonerating Officer DeSantis on all counts, implicitly finding that the two shots he fired were necessary to eliminate the threat Hicks posed to his mother's safety. Alternatively, however, the plaintiff contended that Officers Henderson, Powell, and Stewart used excessive force when they repeatedly shot and finally killed Hicks after DeSantis had effectively disabled him as a threat to anyone's safety. The jury apparently accepted this theory over the testimony of the officers that they began firing and continued to do so—for a period of no more than eight seconds—because Hicks still held the knife in his hand or was reaching toward it on the ground while trying to regain his feet.[6]

## II.

The District contends, for different reasons, that the damage award cannot be sustained as to any of the three counts. It argues that as a matter of law: the officers were entitled to immunity on the excessive

---

5. Various witnesses for the plaintiff testified, for instance, that they had never seen the alleged hostage knife in Mrs. Haley's apartment. None had witnessed the actual encounter.

6. The jury found Sergeant Jackson to have been negligent but rejected liability as to him on the other two counts. The award of one dollar in compensatory damages as to him is not at issue on appeal. No claim of liability as to Lieutenant Durham was submitted to the jury.

force (§ 1983) claim; the force they used was privileged with respect to the claim of assault and battery; and the plaintiff failed to prove negligence *per se* by presenting no expert testimony on the standard of care or deviation from it.[7] We consider first the challenge to the verdict on assault and battery because, as will appear in part II.B., *infra*, resolution of that challenge moots the District's other two attacks on the compensatory damage award.

### A.

In *Holder v. District of Columbia*, 700 A.2d 738 (D.C.1997), the court stated:

> Although assault and battery are technically distinct intentional torts, in cases like this one they are often pled in conjunction as a single count. An assault is an intentional and unlawful attempt or threat, either by words or acts, to do physical harm to the plaintiff. A battery is an intentional act that causes a harmful or offensive bodily contact. In most cases involving intentional shootings by police officers the technical requirements of assault and battery are satisfied and the outcome of the case turns on the defense of privilege.
>
> A police officer has a qualified privilege to use reasonable force to effect an arrest, provided that the means employed are not in excess of those which the actor reasonably believes to be necessary. Moreover, any person, including an officer, is justified in using reasonable force to repel an actual assault, or if he reasonably believes he is in danger of bodily harm. Use of deadly force, however, is lawful only if the user actually and reasonably believes, at the time such force is used, that he or she (or a third person) is in imminent peril of death or serious bodily harm.

*Id.* at 741 (citations and internal quotation marks omitted). Without objection, the trial judge instructed the jury here in accordance with these principles.[8]

The District argues, nonetheless, that as a matter of law the actions of Officers Henderson, Powell, and Stewart—shooting at Hicks until he was dead—did not exceed the force reasonably necessary to prevent serious bodily harm to Mrs. Haley or themselves. The issue is an acutely difficult one because, as the Supreme Court has said in oft-quoted language:

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.... The calculus of

---

7. The District also asserts two trial errors, neither of which requires extended discussion. First, the trial judge had a fully adequate basis on which to conclude that the District's own proffered expert on the use of reasonable force was unqualified to testify regarding the national standard of care—an issue of admissibility, as the District concedes, committed to the trial court's discretion. *See, e.g., In re Melton*, 597 A.2d 892, 897 (D.C.1991) (en banc). Second, the District was not prejudiced in the circumstances by the opinion of the plaintiff's witness Glen Murphy, who was permitted to testify only on an issue of fact, but who volunteered a quasi-expert opinion that the police faced no "threat" from Hicks when they continued shooting at him.

8. The District now argues that the force used must be *"clearly* excessive" (emphasis added) for a police officer to forfeit the privilege, relying on *Jackson v. District of Columbia*, 412 A.2d 948 (D.C.1980). Beyond the fact that it did not seek to have this intensifier incorporated in the instructions given, however, *Jackson* adopts the standard of "clearly excessive" as distinct from "excessive" force with respect to the *"threatened* use of force," *id.* at 956 (emphasis in original), in contrast to the actual application of force—a battery—that took place in this case. *See also id.* at 956 n. 17.

reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Graham v. Connor,* 490 U.S. 386, 396–97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (citations omitted). At the same time, however, the judge instructed the jury on these considerations,[9] and this court may not set aside the jury's determination of whether an unlawful battery was proved unless, viewing the evidence most favorably to the plaintiff, no "impartial juror [could] find that [the officers] used excessive force and failed to act with reasonable prudence when [they] shot [Hicks]." *Etheredge v. District of Columbia,* 635 A.2d 908, 918 (D.C.1993).

■ Applying these standards, we uphold the jury's verdict. The District argues that, beyond the inherent danger and need for split-second judgments in this hostage situation involving a knife, the uniform testimony of officers who were able to estimate the time was that at most six to eight seconds elapsed between the first and last shots fired by Henderson, Powell, and Stewart.[10] But the jury also heard testimony from Lieutenant Durham that pauses occurred between successive rounds of shots, and from Mrs. Haley that as the shooting continued she heard one officer say to the others, "why don't you stop shooting ... why [do] you keep on shooting or whatever?" Testimony further permitted the inference that Officer DeSantis had moved Mrs. Haley well out of Hicks's reach after the first two shots, and that the danger to the officers as they kept firing was from a man who was now on all fours, had dropped the knife, and was two to three feet away from it, as Henderson testified. (Jackson and Stewart stated that Hicks had never let go of it.)[11] Although Hicks was "scrambling" toward the knife, according to Henderson, the jury could still infer a lack of reasonable restraint by the police from the evidence just recited and from the fact that the officers shot Hicks as many as seven times in the back, including a fatal shot to the back of the head. All told, we cannot say that a jury applying the preponderance of the evidence standard to these facts could reach only one conclusion on the issue of excessive force.

## B.

■ With respect to the § 1983 count based on a Fourth Amendment violation (excessive force), the District argues that in the circumstances of this case the officers were entitled to qualified immunity. It contends first, however, that the trial judge erred in submitting that issue to the jury when case law makes clear that it is an issue of law for the court. We agree, particularly in light of *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), decided after the trial of this case, that qualified immunity in an excessive force case—as in any other—is ultimately an issue of law for the court to decide. In *Sabir v. District of Columbia,* 755 A.2d 449 (D.C.2000), also partly a § 1983 action

---

9. She explained that "[t]he reasonableness of a particular use of force must be judged from the perspective of a reasonable officer at the scene [r]ather than with the 20–20 vision of hindsight."

10. Other than the officers only Mrs. Haley testified—by deposition—as an eyewitness.

Although she stated that the shooting seemed "forever"—"[i]t was a long time, [those] bullets were just going off"—she could not estimate the number of seconds.

11. Powell was not called as a witness.

based on the claimed use of excessive force, this court recognized that in general qualified immunity presents "a question of law—'whether the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions.'" *Id.* at 455 (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 528, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)). Earlier still, in *Fulwood v. Porter,* 639 A.2d 594 (D.C. 1994), we explained that while "disputed factual issues relevant to the [qualified] immunity issue are, as in any other case, submitted to the trier of fact, . . . 'the purely legal issue on which [the] claim of immunity turns' remains for the court to decide." *Id.* at 598–99 n. 8 (quoting *Mitchell,* 472 U.S. at 530, 105 S.Ct. 2806).

Any doubt that the issue is one of law, even in excessive force cases, was settled by *Saucier* in which the Supreme Court rejected the notion that the reasonableness of force used by police in arresting a person is the same question as the reasonableness of their conduct for purposes of qualified immunity—hence (as the lower court had ruled) making the latter question one for the jury to decide. Qualified immunity, the Court explained, requires a two-fold inquiry by the trial court: (1) "Taken in the light most favorable to the party as-

serting the injury, do the facts alleged show the officer's conduct violated a constitutional right?," 533 U.S. at 201, 121 S.Ct. 2151; and (2), if so, "whether the right was clearly established" at the time of the conduct, the "dispositive inquiry" there being "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 201–02, 121 S.Ct. 2151. The second inquiry is essential because "[a]n officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense." *Id.* at 205, 121 S.Ct. 2151. But both parts of the inquiry are questions for the court to answer. *See id.* at 197, 200, 206, 207, 121 S.Ct. 2151.[12]

■ In this case, the trial judge submitted the question of immunity entirely to the jury, telling it among other things to decide "by a preponderance of the evidence" whether the officers "knew [ ]or should have known that their actions violated federal law."[13]   As the District

---

**12.** Although *Saucier* makes clear that the qualified immunity inquiry is ultimately for the court to make, its analysis does not appear to affect our observation in *Fulwood* and later *Sabir* that issues of historical fact may need to be submitted to the jury, perhaps on special interrogatories. *See also District of Columbia v. Evans,* 644 A.2d 1008, 1014–15 n. 4 (D.C.1994). *Saucier*'s "analytical framework," one court of appeals has observed, "does not appear at all inconsistent" with the principle that "disputed, historical facts material to the objective reasonableness of the officer's conduct will give rise to a jury issue." *Curley v. Klem,* 298 F.3d 271, 278 (3d Cir.2002).

**13.** The "federal law" the judge described to the jury, however, was merely that "[a]t the

time of the incident giving rise to the lawsuit it was clearly established that the Fourth Amendment to the United States Constitution protects persons from being subject to excessive force while being arrested." That "general proposition," the Supreme Court reiterated in *Saucier,* "is not enough" to resolve the immunity question; instead "the right the official is alleged to have violated must have been clearly established in a more particularized and hence more relevant sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." 533 U.S. at 201–02, 121 S.Ct. 2151 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (internal quotation marks omitted)). Developing the contours of the right "with greater degrees of

points out, *Saucier* now forecloses that course of action. But the District is not in a position to complain of this error, because it did not object to the jury instruction on immunity; indeed, not until its post-verdict motion for judgment as a matter of law did it argue that the issue should be decided in its favor as one of law. As in *Sabir, supra*, therefore, we would be within our right to conclude that the claims of instructional error and entitlement to immunity as a matter of law come too late. *See* 755 A.2d at 455–56 (where "the government did not assert its immunity defense until the close of the case when the judge was preparing his [jury] instructions," this court would not "disturb the trial court's ruling" that the officers acted beyond the reach of qualified immunity protection).

It is unnecessary, however, for us to assess the effect of any error in the judge's treatment of the qualified immunity issue, and we likewise can ignore the District's claim that the plaintiff's proof of negligence *per se* failed for lack of an expert on the standard of care and deviation from it. The reason is that we have sustained the officers' liability for assault and battery, and the jury returned a single verdict of compensatory damages (apportioned equally among the officers) reflecting the principle that—as the trial judge told the jury—a plaintiff is entitled to a single "amount [that] will fairly and reasonably compensate the plaintiff for injuries and damages." *See Woodward & Lothrop v. Hillary*, 598 A.2d 1142, 1146–47 (D.C.1991) ("[A] cardinal principle of law is that ... a plaintiff can recover no more than the loss actually suffered"; "actual injury remains the touchstone." (citations and internal quotation marks omitted)). The plaintiff's entitlement to be made whole, in other words, did not depend on how many different (and overlapping) theories of liability were submitted to the jury. *See, e.g., id.* at 1147 ("The purpose of money damages recoverable for violation of constitutional or federal rights under § 1983, like that of common law damages, is to provide compensation for the injury caused by the defendant's breach of duty (or intentional tort).").[14] Because the finding of liability for assault and battery is sufficient to support the unitary award of compensatory damages (as remitted by the judge, see part IV, *infra*), and because we strike the award of punitive damages, see part III, *infra*, the District's challenges to the verdicts on negligence and the § 1983 count are moot.[15]

specificity" is the task of the courts from case to case. *Id.* at 207, 121 S.Ct. 2151.

14. The jury was accordingly told that, without proof of actual damages, it could award the plaintiff separate damages for a § 1983 violation only "in some nominal amount not to exceed the sum of $1.00."

15. The District asserts that the plaintiff's failure to present an expert on standard of care and deviation from it undermined her proof not only of negligence but of assault and battery as well, since in this context each tort "fundamentally involve[s] an inquiry into the reasonableness of the police officer[s'] actions." *Holder*, 700 A.2d at 742. We decline to consider this argument, which has not been briefed by either party and was raised in this court only at oral argument in response to a question from the bench. Whether proof of assault and battery—an intentional tort—based on excessive force requires the *plaintiff* to present expert testimony on the reasonableness of police conduct is a subtle issue, the answer to which might depend, for example, on whether in asserting the "lack of excessive force as a *defense* to assault and battery," *id.* at 744 (emphasis added), the defendant itself has come forward with admissible expert testimony on the point, something the District failed to do in this case. See note 7, *supra*. We leave the issue for a case in which it has been adequately presented.

We likewise have no occasion to consider here the issue raised by the District in another case pending before the court, of whether it is

## III.

█ We have held that the jury could fairly find by a preponderance of the evidence that the three officers used excessive force in shooting Hicks to death, and thus could properly award compensatory damages to his estate. The award of punitive damages, however, presents a different issue. The District argues, as it did below, that no reasonable jury could find by clear and convincing evidence—as it was required to—that a police shooting which spanned at most eight seconds and evolved from a hostage-taking in which the victim was about to be stabbed when the shooting began presents "circumstances of extreme aggravation," *Sere v. Group Hospitalization, Inc.*, 443 A.2d 33, 37 (D.C. 1982), sufficient to justify punitive damages. We agree.

> [T]o sustain an award of punitive damages, the plaintiff must prove, by a preponderance of the evidence, that the defendant committed a tortious act, and by clear and convincing evidence that the act was accompanied by conduct and a state of mind evincing malice or its equivalent.

*Jonathan Woodner Co. v. Breeden*, 665 A.2d 929, 938 (D.C.1995). Although "the requisite state of mind ... may be inferred from all of the facts ... of the case," *King v. Kirlin Enters., Inc.*, 626 A.2d 882, 884 (D.C.1993) (citation and quotation omitted), we recently emphasized the dual nature of the plaintiff's burden on punitive damages by quoting with approval the standard civil jury instruction, as follows:

> You may award punitive damages only if the plaintiff has proved with clear and convincing evidence:

> (1) that the defendant acted with evil motive, actual malice, deliberate violence or oppression, or with intent to injure, or in willful disregard for the rights of the plaintiff;

> AND

> (2) that the defendant's conduct itself was outrageous, grossly fraudulent, or reckless toward the safety of the plaintiff.

*Croley v. Republican Nat'l Comm.*, 759 A.2d 682, 695 (D.C.2000) (quoting Standardized Civil Jury Instructions for the District of Columbia, No. 16–1 (1998 ed.)); *see also United Mine Workers of Am., Int'l v. Moore*, 717 A.2d 332, 341 (D.C. 1998) (to prove punitive damages, "[a] showing of evil motive or actual malice is ... required") (citation omitted).

█ Viewing the evidence in the light most favorable to the plaintiff, *Croley*, 759 A.2d at 695, no reasonable juror could have found by the "more stringent" proof requirement of clear and convincing evidence, *id.* at 696, that the officers shot Hicks with an evil motive or actual malice. As the District points out, there was no evidence that the officers knew Hicks or had ever had any contact with him before they entered his mother's apartment. Thus, any inference that they acted maliciously must derive from the events of the shooting itself. More particularly, since neither the manner of entry by the ERT members nor the initial shots fired by Officer DeSantis support such an inference (the jury found DeSantis's actions to be justified), the malice would have to be inferred from the failure of the police to restrict their use of force during a period the judge herself—in denying the Dis-

---

even proper to submit a case of alleged use of excessive force by the police to the jury on counts both of negligence and of assault and battery—whether, that is, "negligence" and

the intentional tort are not inherently contradictory in this context. The issue has not been raised in this case at any point.

trict's post-trial motion—agreed was no more than eight seconds.[16] And it would have to be inferable despite the intense provocation the officers had experienced in confronting a man who was "almost irrational" and an instant before had tried to stab his mother in the chest. As a matter of law, the lack of restraint which the jury could properly find in holding the officers liable for unlawful battery does not support a finding of malice by clear and convincing evidence.

### IV.

Lastly, we consider the cross-appeal and the propriety of the remittitur ordered by the trial judge which reduced the compensatory damages to a total of $180,000, apportioned equally among the three officers. We summarized the governing law on this subject in *George Washington Univ. v. Lawson*, 745 A.2d 323, 331 (D.C.2000):

> The trial court may grant a new trial subject to a remittitur if the verdict "is so large that 'it is beyond all reason or is so great as to shock the conscience.'" *Sigal Construction Corp. v. Stanbury*, 586 A.2d 1204, 1220 (D.C.1991). As this standard implies, "[o]ur own decisions, and hence the conduct of judges in the Superior Court, reflect[ ] a[n] . . . unwillingness to interfere with the jury's calculation of damages" unless there is "firm support in the record" for such action. *Finkelstein v. District of Columbia*, 593 A.2d 591, 595, 596 (D.C. 1991) (en banc) (citations and internal quotation marks omitted). Once the trial court has set a damage award aside and stated its reasons, however, this court will "accord great deference" to

that decision. *Id.* (citations and internal quotation marks omitted).

> [G]iven both the traditional self-restraint exercised by trial courts in this area and the trial judge's unique opportunity to consider the evidence in the living courtroom context, we have followed the rule—and we do so today—that we will reverse the grant of a new trial for excessive verdict only where the quantum of damages found by the jury was *clearly* within the maximum limit of a reasonable range. Every doubt on that score will be resolved in the trial court's favor.

*Id.* (emphasis in original; citations, quotation marks, and footnotes omitted). *See also Safeway Stores, Inc. v. Kelly*, 448 A.2d 856, 864 (D.C.1982) (trial court has "broad discretion" to order a new trial conditioned on refusal of a remittitur).

■ The trial judge explained her decision to remit as follows:

> The jury awarded the Estate of Terrence Hicks (whose beneficiary is his daughter Ladoska Leftwich)[17] compensatory damages against the District of Columbia acting through defendants Powell, Henderson and Stewart totaling $2,149,998. (The jury apportioned $716,666 to each officer).

> \* \* \* \* \* \*

> The undisputed evidence in this case is that the decedent was shot and rendered unconscious during a brief period of several seconds and died a short time later. There is no evidence in the record that he was employed or that he had contributed financial support to Ms. Leftwich or that she had lived with him for any extended time in the years im-

---

16. Plaintiff has cited no decision of this court or of any other sustaining an award of punitive damages for excessive force spanning so short a time in a hostage situation.

17. Ms. Leftwich was thirteen years old at the time of the shooting.

mediately prior to his death. Ms. Leftwich testified specifically that she did not live with him while he was living with the girlfriend with whom he had been involved at the time of his death. On the other hand, according to Ms. Leftwich, he washed and braided her hair, helped her with homework, went on school field trips, took her to school and picked her up from school. According to Plaintiff Felicia Jackson (the decedent's sister), Ms. Leftwich had a "beautiful" relationship with her father, who, with his mother, Mary Haley, had helped to raise her.

On these facts, the judge concluded that the verdict of $2,149,998 in compensatory damages "clearly exceeds the 'maximum limit of a reasonable range' justified by the evidence" (quoting *Finkelstein*, 593 A.2d at 596).

"[R]esolving in favor of that [conclusion] any doubt [this court] might have on whether 'the quantum of damages was *clearly* within the maximum limit' of reasonableness," *Lawson*, 745 A.2d at 331 (citation omitted), we find no abuse of discretion by the judge. As she went on to explain, "the award of compensatory damages totaling $2,149,998 is out of proportion to decedent's very brief (but real) pain and suffering and [to] the loss of services and care, education, training, guidance and parental advice this particular decedent, based on the record, could have been expected to give Ms. Leftwich for five years until she turned eighteen." The plaintiff presented no evidence of lost future earnings by Hicks or of medical or funeral expenses or other special damages; and, as the judge pointed out, there was no evidence that the daughter had lived with him or received any financial support from him. Thus, beyond the limited proof of

services, care, guidance and training Hicks had given her, the only damages supported by the evidence were his pain and suffering during the period of up to eight seconds before he lost consciousness.[18] In these circumstances, the judge was within her proper bounds in concluding that the jury's calculation of damages "resulted from passion, prejudice, mistake, oversight, or consideration of improper elements," *Finkelstein*, 593 A.2d at 596 (quoting *Louison v. Crockett*, 546 A.2d 400, 403 (D.C.1988)), and so required either a new trial on damages or a remittitur.

## V.

For the reasons stated, we uphold the verdict on assault and battery and the award of compensatory damages as remitted, and reverse the award of punitive damages.

*So ordered.*

---

18. The plaintiff's contention that the § 1983 violation resulted in separate actual, compensable damages is erroneous for the reason stated in part II.B., *supra*.