**Rupert E. LOUISON, M.D., Appellant,**

v.

**Charlene CROCKETT, et al., Appellees.**

No. 87–491.

District of Columbia Court of Appeals.

Argued March 17, 1988.

Decided Aug. 5, 1988.

Brian J. Nash, Rockville, Md., with whom Alice J. Hooker, Washington, D.C., was on the brief, for appellant.

Emil Hirsch, Bethesda, Md., with whom Stephen S. Millstein, Washington, D.C., was on the brief, for appellees.

Before MACK, BELSON and ROGERS, Associate Judges.

BELSON, Associate Judge:

A jury returned a $725,000.00 award for the appellees, Charlene Crockett and Archie Ray Crockett, in this negligence action. On appeal, the only issue is whether the trial court abused its discretion in denying appellant Rupert E. Louison's motion seeking remittitur or new trial by reason of excessive verdict. Because the high award of damages was premised mainly on psychological injury to Charlene Crockett from which, it appears, she had largely recovered by the time of trial, we are unable to determine whether the trial court abused its discretion in denying appellant's motion unless we know the reasons for the trial court's action. Accordingly, we remand the record for a written statement of the reasons for the trial court's denial of appellant's motion for remittitur or new trial.

### I.

Charlene Crockett and her husband, Archie Ray Crockett, filed suit against Rupert E. Louison, M.D., alleging that negligence in the use of a diathermy machine by Dr. Louison's employee caused a burn to Charlene Crockett. In her complaint, Mrs. Crockett alleged that as a result she experienced severe and permanent injuries, continuing pain and suffering, and severe mental and emotional problems that require continued psychiatric treatment; that she had been rendered incapable of performing the ordinary duties of a wife and mother; that her education had been disrupted; and that she had incurred and would continue to incur expenses for treatment. Mr. Crockett claimed loss of consortium. We will describe the evidence, especially that which relates to damages, in some detail

because of the nature of the issue before us.

The Crocketts introduced evidence that in early December 1982, Charlene Crockett was a passenger in an automobile which was involved in an accident. Mrs. Crockett contacted Dr. Rupert E. Louison, a board-certified surgeon, for treatment of the neck injuries she sustained. Dr. Louison prescribed muscle relaxants and diathermy treatment for Crockett's neck and back.[1] The diathermy machine, a Burdick Microwave 225, was located in Dr. Louison's office.

On December 21, 1982, Crockett went for her third diathermy treatment. Dr. Louison's employee adjusted the machine to localize treatment to the back of Crockett's neck but, according to Crockett, did not instruct her to remove her blouse or jewelry. The assistant then set the timer and left the room. Within a couple of minutes Crockett heard what she described as a "sizzling sound" which suddenly got "louder and louder" until she "felt the flames ... to the back of [her] head." As Crockett described it: "I put my hand in the back of my head and beat it with my hand. And I jumped up and screamed, 'I'm on fire, I'm on fire.'" Dr. Louison, who had not been immediately present when the treatment had been initiated, heard her cry and entered the room. Dr. Louison testified that, upon examining Crockett after the incident, he observed redness on the back of her neck that "was the size of a, at most, would be a half dollar in size.... And the edges of her hair were singed, the back of her neck.... It was a first degree burn." Crockett testified that she "was burned on the left-hand side of my neck and a batch of hair was burned out in the back. And I also received a burn on my right hand ... [b]etween my thumb and index finger." According to Crockett, her hair was not merely singed, but "was burned down almost to my skin." Dr. Louison then gave Crockett some cream for the burn, some pain pills, and a cup of orange juice.

---

1. Microwave diathermy therapy of the type received by appellee involves significant temperature increases in muscle tissue through high-frequency radiation, resulting in both increased blood flow and deep tissue heating. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 373 (26th ed. 1981).

Mrs. Crockett drove herself home and tried unsuccessfully to get in touch with her husband. Later that day, she decided to have a friend drive her to Providence Hospital. According to Crockett, the medical personnel at the emergency room there told her "that since Dr. Louison had already given me something for pain that they wasn't going to give me anything else for pain, and if I continued to have problems, to go to my private physician."

Crockett testified that when she got home from the hospital, she was "very nervous. I was upset. I couldn't—I tried to prepare dinner. I couldn't prepare dinner.... My neck was in pain. My hand was in pain. The side of my head just seemed like half the side of my head felt like it was still burning." That evening "was just miserable. I couldn't sleep." Crockett could not recall events of the next day.

Within a day or two of being burned, Crockett went to the office of Dr. Elmer Rones, her family physician, because she "couldn't sleep" and "felt nervous." Dr. Rones did not have an opportunity to see Mrs. Crockett on her first visit because, as she explained, "I was so upset, I just couldn't stay in the office and wait my turn." She went back shortly thereafter, on or about December 23, and was seen by Dr. Rones. He testified that he did not consider the burns to be serious, characterizing them as burns in the first and second degree. Dr. Rones gave Crockett prescriptions for nerve medication, as well as for medication to enhance her appetite. She did not take these medications, however, because they made her sick to the stomach. Crockett denied that she had had similar symptoms of nervousness after the automobile accident.

Crockett testified that the Christmas holidays "were miserable." She had no appetite and could not sleep, and the problems she "was experiencing seemed to have gotten worse, started to get worse." Her two older daughters were home from school, but Crockett stayed mostly in her bedroom. One daughter had to move her bedroom because at night Crockett "could be laying in bed; and all of a sudden, I would wake up and start to hollering and screaming and crying. And [the daughter] couldn't rest." Crockett's relationship with her husband "was terrible." Her husband and daughters in effect took over household duties. Furthermore, after the burn Crockett had no interest in going places with her husband, and they had no sexual relationship "at all." At no time, however, did her daughters ever have to stay home from school to help out at home.

About two weeks after receiving the burn, Crockett went to see a psychiatrist, Dr. Alexander Doudoumopoulos. She contacted him on her own, without the knowledge of her treating physician, Dr. Rones. She went to see the psychiatrist "[b]ecause I was experiencing problems I had never experienced before. And after talking to a friend of mine, [the friend] suggested I go and see a psychiatrist." Crockett testified that her problems included hearing voices and seeing bright lights that were not there. She "wasn't eating. I had lost my appetite completely. I couldn't sleep. I was having nightmares." She "lost friends because of my problems because they could not understand what I was going through with." Dr. Doudoumopoulos told Crockett she "was experiencing a trauma, and he gave [her] medication for it." According to Crockett, at first Dr. Doudoumopoulos wanted to put her into a mental hospital. After her initial visit in late December 1982, Dr. Doudoumopoulos saw her on January 4, February 1, February 16, and March 17, 1983, and then not again until August 29, 1983. He prescribed Stelazine, Thorazine and, later when she started having crying spells, Dezerol for depression. Dr. Doudoumopoulos gave Crockett no other kind of treatment in addition to the sessions with her and the medication. No psychiatrist other than Dr. Doudoumopoulos rendered services to Crockett.

Before the burning incident, Crockett had been involved in various activities. Having ceased her employment some years before because of a back injury, she was taking a photography class and doing volunteer work at the LaSalle Elementary School. She described her family life as

happy. After the incident, however, things changed. Crockett lost about 25 pounds. She went to Detroit in April 1983 to be with her family for a while, "hoping that they could take care of me, and I could get better." The record reflects no medical treatment received by Crockett while in Detroit. Crockett was no better upon returning from Detroit, however, and she resumed her visits with Dr. Doudoumopoulos in August 1983.

Sometime thereafter, apparently by 1985, the medicines prescribed by Dr. Doudoumopoulos "helped her progressively recover." By the time of trial, she had been off medications for six months. She had been seeing Dr. Doudoumopoulos only once every month or two, and, when asked whether she would need some treatment in the future, he opined that it was "very possible, but not with the intensity that she had had in the past. Maybe around Christmas time, she may want to see me." Consistent with the testimony of Dr. Doudoumopoulos and the other members of the family, one of Mrs. Crockett's daughters testified that her mother was "pretty much" back to the way she was before. In short, as we will discuss in more detail below, both Mrs. Crockett's psychiatrist and members of her family testified that she had largely recovered from the emotional injury caused her by the burn. In all, Mrs. Crockett incurred medical expenses and other special damages in the amount of $3,875.00.

At the conclusion of trial, the jury returned a verdict in favor of the plaintiffs in the amount of $650,000.00 on Mrs. Crockett's negligence claim, and $75,000.00 for Mr. Crockett's loss of consortium. Appellant filed a motion for judgment notwithstanding verdict or in the alternative for remittitur or a new trial. The trial court, without oral argument, denied this motion in a brief order.[2] This appeal followed.

## II.

■ "[T]rial courts have historically given great weight to jury verdicts, granting a new trial only where there are unusual circumstances which convince the trial judge, who has also heard the evidence and seen the witnesses, that the jury had been improperly influenced by non-germane factors or that its verdict is clearly unreasonable." *Vassiliades v. Garfinckel's, Brooks Bros.*, 492 A.2d 580, 595 (D.C.1985); *Davis v. Abbuhl*, 461 A.2d 473, 475 (D.C. 1983). When a party moves to strike a verdict as excessive, the trial court must consider whether that verdict resulted from passion, prejudice, mistake, oversight, or consideration of improper elements. *E.g., Weinberg v. Johnson*, 518 A.2d 985, 994 (D.C.1986); *Vassiliades, supra,* 492 A.2d at 594; *Spar v. Obwoya,* 369 A.2d 173, 180 (D.C.1977). The trial court must ask whether the verdict is "beyond all reason, or ... so great as to shock the conscience." *Vassiliades, supra,* 492 A.2d at 594 (quoting *Wingfield v. Peoples Drug Store, Inc.,* 379 A.2d 685, 687 (D.C.1977)).

■ On appeal, this court applies an abuse of discretion standard to review the trial court's grant or denial of motion for remittitur or new trial for excessiveness of verdict. *Lacy v. District of Columbia,* 408 A.2d 985, 988 (D.C.1979). We "must accord great deference to the trial court's decision to grant or deny a motion for new trial based on excessiveness of the verdict and may reverse that decision only for an abuse of discretion." *Int'l Sec. Corp. of Va. v. McQueen,* 497 A.2d 1076, 1081 (D.C. 1985). Thus, in cases where the trial court has granted such a motion, we have held that

[b]ecause the views of the trial judge are, like those of a jury, entitled to considerable deference, "we will reverse the grant of a new trial for excessive verdict only where the quantum of damages found by the jury was clearly within 'the maximum limit of a reasonable range.'"

*Lacy, supra,* 408 A.2d at 988 (quoting *Hines v. Safeway Stores, Inc.,* 379 A.2d

---

**2.** The trial court's order stated in full as follows: Upon consideration of the motion of defendant for judgment notwithstanding the verdict, or in the alternative, for remittitur or a new trial and the opposition of plaintiff to such motion, it is this 20th day of April, 1987,
    ORDERED, that the Motion is denied.

1174, 1176 (D.C.1978)). Where the trial court has granted a motion for remittitur or new trial, this court must determine whether

> ... there is firm support in the record for a finding by the trial judge that the verdict is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate, given the respect accorded the judge's unique opportunity to consider the evidence in the living courtroom context.

*Weinberg, supra,* 518 A.2d at 994 (quoting *Lacy, supra,* 408 A.2d at 988–89)).

■ In considering denials of motions for remittitur or new trial, we must be "particularly reluctant to substitute our judgment for that of the trial judge who was present at and observed the entirety of the ... trial. We give his decision not to disturb the verdict substantial weight and will reverse only for an abuse of discretion." *Capitol Hill Hospital v. Jones,* 532 A.2d 89, 92 (D.C.1987). Indeed, "[a] popular slogan is that the appellate court should reverse the trial court's denial of a motion for a new trial on the ground of excessive verdict only when the damage award is 'monstrous.'" *Taylor v. Washington Terminal Co.,* 133 U.S.App.D.C. 110, 113 n. 9, 409 F.2d 145, 148 n. 9, *cert. denied,* 396 U.S. 835, 90 S.Ct. 93, 24 L.Ed.2d 85 (1969); *see City Stores Co. v. Gibson,* 263 A.2d 252, 252–53 (D.C.1970) (verdict must be "monstrous or shocking" to justify appellate reversal of trial court's denial of motions (quoting *National Food Stores, Inc. v. Utley,* 303 F.2d 284 (8th Cir.1962))). In sum, "[w]here appeal is taken from the denial, rather than the granting, of a new trial motion on the ground of excessive verdict, two factors—deference to the trial court *and* deference to the jury—point to 'very restricted review' of the decision." *McQueen, supra,* 497 A.2d at 1081 n. 10 (quoting *Taylor, supra,* 133 U.S.App.D.C. at 113, 409 F.2d at 148). In exercising this so-called double deference, *i.e.,* deference to both jury and trial court, this court has been so reluctant to reverse a trial court's denial of a motion for remittitur or new trial that we have yet to do so. Yet, this court has a function to fulfill in this context, and we agree with the Second Circuit that "[w]hatever the opinion of the trial court, we must make our assessment of the evidence to determine whether there has been a denial of justice." *O'Gee v. Dobbs Houses, Inc.,* 570 F.2d 1084, 1089 (2d Cir. 1978).

### III.

The gravamen of Dr. Louison's argument on appeal is this:

> In essence, Mr. and Mrs. Crockett received $750,000.00 plus interest for a bad Christmas in 1982 immediately after the incident when Mrs. Crockett could not function, as well as for the first three months of 1983 when she began her therapy with Dr. Doudoumopoulos. *Clearly, there is no firm support in the record below to support [the trial court]'s denial of Dr. Louison's post-trial motions. Moreover, the trial judge gave no indication as to why he denied the motion nor cited support in the record for his decision.* There is no reasonable basis for the denial of the post-trial motions as the jury verdict is well beyond the reasonable range of verdicts which might be awarded in a case such as the one at bar. As such, the trial court abused its discretion in failing to grant a new trial on the issue of damages or for remittitur on the jury's verdict.

Brief of Appellant at 7 (emphasis supplied). Appellees contend, by way of response, that

> [a]ppellant conveniently fails to recognize the medical and psychological evidence presented at trial that the incident in Dr. Louison's office had made Mrs. Crockett a "borderline psychotic" ... and similarly ignores *the evidence that Mrs. Crockett would require treatment in the future in that she was suffering from a psychosis that was "becoming more progressive now."*

Brief of Appellees at 14 (emphasis supplied).

■ We have carefully examined the record in the context of the issues as

framed by the parties, and we come away as yet unconvinced that the jury's award, given its evidentiary base, was within "the maximum limit of a reasonable range." *Lacy, supra,* 408 A.2d at 988 (quoting *Hines, supra,* 379 A.2d at 1176). While it is true that all we have to consider at present is the paper record as developed before and during trial, our review of that record uncovers certain aspects of the case that make us reluctant to uphold the trial court's decision on the basis of what is before us at this time. In order to make it possible for us to affirm, under the particular circumstances of this appeal, we need a reasoned explanation by the trial judge of the basis for his decision that the verdict was not excessive. Of principal concern are (1) the nature of Crockett's psychological condition after the early part of 1985, the time her condition began to improve considerably, and (2) the extent to which, as of trial, Crockett's condition fairly could be characterized as lasting or permanent, portending anything other than the possibility of infrequent future treatments. We expand on these concerns below.

Although Dr. Doudoumopoulos testified that as of his initial examination he found Crockett "confused" and only "partly oriented," with the result that "she really could not function very well outside," he permitted her to go home alone after this first visit and did not see her again until "[a] week later." The next visit followed after nearly another month. Dr. Doudoumopolous' actions hardly comport with his characterization of Crockett as a "borderline psychotic," words on which appellee places great reliance. Furthermore, despite the fact that Dr. Doudoumopoulos stated from the witness stand that at the time of his initial contact with Crockett he considered her "a basket case," the fact remains that from the beginning he saw her no more than once every two weeks. Indeed, between the first visit in December of 1982, and the trial in March of 1987, a period of over fifty months, Dr. Doudoumopoulos had seen Crockett just forty-eight times.[3] Thus, we are troubled because Dr. Doudoumopoulos' course of treatment seems at odds with the nature of Crockett's mental condition as he described it from the stand. One would ask, if her condition was as serious as indicated, why Dr. Doudoumopoulos saw her so infrequently, not seeing her at all between January 4 and February 1, 1983, and never speaking at all with her husband or other family members. In addition, even as he described Crockett as "almost a psychotic individual," Dr. Doudoumopoulos stated that his overall diagnosis was that Crockett was suffering from a "post-traumatic neurosis." Significantly, Dr. Doudoumopoulos explained that "[n]eurosis means an incapacitation *that's not permanent.*" (Emphasis supplied.) Thus, although Dr. Doudoumopoulos saw "the possibility" that Crockett would relive the incident "every Christmas," his "prognosis" was of "her progressively getting back to the full routines ... finish[ing] her education and get[ting] out of the house and becom[ing] an active member of our community." Significantly, in terms of future treatment, Dr. Doudoumopoulos testified that such treatment was "very possible, but not with the intensity that she has had in the past. Maybe around Christmas time, she may want to see me." In our view, while the possibility of an annual Christmas visit to the psychiatrist is not to be ignored, neither is it so significant as to serve as the basis for propelling this case into the category of those that merit extraordinarily high awards of damages.

In addition to the testimony of Dr. Doudoumopoulos, which suggested that at the time of trial Crockett was much improved and still improving from the condition he identified as a nonpermanent neurosis, Dr. Rones and members of the Crockett family also described a patient very much on the mend. In his report of October 25, 1983, Dr. Rones had described Crockett as complaining of being a nervous wreck, with shaking, loss of appetite, and difficulty sleeping. At trial, however, when asked

---

3. Dr. Doudoumopoulos admitted that, despite those many, but infrequent, visits, he had yet to be paid for his services. Thus, asked whether he had "an interest in Mrs. Crockett's winning this litigation," Dr. Doudoumopoulos replied, "yes."

whether he had "seen any recurrence of the symptoms that [he] described in [his] October 25 report," Dr. Rones answered, "No." Archie Crockett, her husband, testified that during the eighteen to twenty month period before trial he had noticed some improvement in his wife's condition, to the point that in the early part of 1985 she "seem[ed] to have gotten better." He described his relationship with his wife as "better" and her relationship with their daughters as "a lot better...." Renee Crockett, appellee's daughter and a high school student at the time of the incident, testified that although her mother was quite upset throughout the Christmas holiday and beyond, "I [saw] an improvement about April of '85." At that point, her mother "seemed to get better...." In response to the question whether, as of the trial date, her mother was "back to the way she was before," Renee responded "[p]retty much, yes." According to Renee, by April 1985 her mother "seemed to talk ... more and do things.... We go to church and to eat and things like that." Janet Crockett, appellee's other daughter and a first-year student at the University of the District of Columbia at the time of the incident, also testified that she began to notice a change for the better in 1985, some two years before trial.

In sum, our review of the record discloses that, physically, Mrs. Crockett's injuries simply were not very consequential. The burn on her neck was neither large nor severe; indeed, Providence Hospital personnel examined Crockett on the day of the injury and sent her home, advising that she consult her family doctor if even that was necessary. Only a small portion of the hair on the back of her head, just above her neck, was burned off. This rules out the possibility of a substantial damages claim for humiliation premised on the period of time until that area of hair grew back. In addition, there was neither permanent disfigurement nor lasting physical impairment. In short, in terms of physical injury, Crockett's injuries cannot justify a large award. Thus, if the jury verdict is to stand, presumably it must rest on the psy-

chological damages sustained by the plaintiff.

It is precisely the element of psychological damages that makes this case particularly difficult on appeal, requiring a remand for the trial court's explanation before we render our decision. We observe that while a trial judge may find psychological harm more difficult to evaluate than most other types of damages, it is not beyond review on a motion for remittitur. *See, e.g., Lacy v. District of Columbia, supra,* 408 A.2d at 987–89. On facts such as those before us, where a plaintiff has suffered no substantial or permanent physical injuries and where her own psychiatrist characterizes her psychological difficulties as a neurosis which is not permanent, and where, as of trial, the plaintiff appeared close to full recovery, we are hard-pressed to approve a ruling that leaves in force so high a verdict. At the same time, we recognize that the trial court determined to do just that.

We have in the past emphasized that the decision to grant or deny remittitur "should not be taken lightly by the trial judge, for it will rarely be disturbed by an appellate tribunal." *City Stores Co. v. Gibson, supra,* 263 A.2d at 252. We emphasize that point again. In the words of Justice Story: "if it should clearly appear that the jury have committed a gross error, or have acted from improper motives, or have given damages excessive in relation to the person or the injury, *it is as much the duty of the court to interfere, to prevent the wrong,* as in any other case." *Blunt v. Little,* 3 F.Cas. 760, 761–62 (C.C.A.Mass. 1822) (No. 1,578) (emphasis supplied).

Given the state of the record before us, however, we simply are unable to assess the reasons behind the trial court's action, and, in light of the circumstances here, we think it imprudent to speculate concerning the trial court's reasons for concluding that the verdict was not "so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate." *Phillips v. District of Columbia,* 458 A.2d 722, 724 (D.C. 1983) (citations omitted). Accordingly, we

are of the view that before we properly can pass judgment on "the elusive phrase 'abuse of discretion'" as applied to this verdict, *Taylor v. Washington Terminal Co., supra,* 133 U.S.App.D.C. at 112–13, 409 F.2d at 147–48, we must first know the trial court's reasons for exercising its discretion as it did, particularly as regards the extent to which the court's decision was influenced by factors present in "the living court-room context," *Weinberg, supra,* 518 A.2d at 994 (citations omitted), but not self-evident from the paper record. *See May Department Stores Co. v. Devercelli,* 314 A.2d 767, 775 (D.C.1973) (trial court in ruling on whether the verdict is excessive "must determine on the totality of facts before it" whether verdict was the result of passion, prejudice or mistake; thus, case remanded where "[o]n the record before us, *we are unable to ascertain* that in resolving that issue [excessive verdict] the ·trial court" made the proper determination (emphasis supplied)).

## IV.

In the circumstances before us, and uninformed regarding the reasons for the trial court's discretionary decision to deny the motion for remittitur, we conclude that we must remand the record to the trial court for a statement of those reasons. We do not suggest that such a statement must accompany every denial of remittitur, for in many cases the reasons for the ruling will be obvious on the record, whereas here the record on its face provides questionable support for the verdict, and elucidation by the trial court might clarify the matter. If the trial judge, upon considering the matter further, should conclude that some remission of the verdict is appropriate, he may cause the case to be remanded for that purpose. *Cf. Smith v. Pollin,* 90 U.S.App. D.C. 178, 194 F.2d 349 (1952).

IT IS SO ORDERED.

Associate Judge MACK concurs in the result only.