**GEORGE WASHINGTON UNIVER-SITY, et al., Appellants/Cross–Appellees,**

v.

**Patricia Y. LAWSON, et al., Appellees/Cross–Appellants.**

**Nos. 96–CV–1588, 96–CV–1751.**

District of Columbia Court of Appeals.

Argued Nov. 10, 1999.

Decided Feb. 17, 2000.

Steven A. Steinbach, with whom Michael K. Ross was on the brief, Washington, DC, for appellants/cross-appellees.

Jack A. Gold, with whom Lawrence S. Lapidus and Anthony G. Newman were on the brief, for appellees/cross-appellants.

Before STEADMAN, FARRELL, and RUIZ, Associate Judges.

FARRELL, Associate Judge:

This appeal and cross-appeal present two primary issues: Did the trial court commit error in allowing the plaintiffs to call an expert witness in rebuttal to testify about a theory of negligence not raised in their case in chief; and did the court abuse its discretion in ordering a new trial unless the plaintiffs accepted a substantially remitted damage amount? We conclude that the trial court did err in allowing the plaintiffs to raise a theory of liability for the first time in rebuttal, but that the defendants were not sufficiently prejudiced by that ruling to warrant reversal. We also conclude that the remittitur fell within the trial court's broad discretion in that area. Accordingly, we affirm the judgment of the trial court.

## I. Background

The plaintiffs, Patricia Y. Lawson and her husband, sued Dr. Michael J. Olding and his employer, George Washington University (hereafter "GWU"), for negligence in making the decision to amputate a portion of Mrs. Lawson's right ring finger. The complaint alleged that Dr. Olding, a GWU plastic and reconstructive surgeon, had negligently amputated the distal phalanx (or upper portion) of Mrs. Lawson's finger unnecessarily without obtaining a definitive diagnosis that it was cancerous. Pathology tests performed during and after the surgery revealed no cancer in the amputated portion of the finger. During their case-in-chief, the Lawsons adduced testimony that Dr. Olding should have had additional tissue tests conducted before deciding to amputate. In particular, they presented testimony that "frozen section" tests could have been utilized during the surgery process itself to determine whether tissue removed so far was cancerous, and thus whether bone amputation

was necessary. Indeed, Dr. Olding had sent "frozen section" specimens for analysis during the surgery, but *after* doing the amputation.

By contrast, defense witnesses testified that Dr. Olding exercised reasonable medical care in amputating the finger portion based upon the accumulated tests and reports before him (the "building blocks" of his diagnosis) showing an aggressively abnormal growth in Mrs. Lawson's fingertip that was more likely cancerous than not and had "tunneled" into a portion of the bone. The frozen section tests, according to Dr. Olding, had been intended merely to confirm whether the malignancy had been removed entirely by the amputation. With the case in this posture, the trial judge was able to comment during GWU's case that "the only question ... essentially for the jury is whether or not Dr. Olding deviated from the standard of care in performing an amputation rather than taking some additional tissue[;] ... it's a ... very straightforward question."

Unfortunately, things proved not to be so straightforward. Dr. Carmen M. Williams, a dermatopathologist employed by GWU who analyzed the biopsy specimens originally taken from the growth (or lesion) on Mrs. Lawson's finger,[1] testified for the defense that she had found the lesion to be "abnormal" and had given it "a differential diagnosis," meaning that it could have been (a) a squamous cell carcinoma (a skin cancer of the upper layer of the epithelium); (b) a keratoacanthoma (a "term [used] interchangeably with squamous cell carcinoma"), or (c) a human papillomavirus (HPV), a non-malignant wart. Asked whether her review of the tissue slides indicated "that it is more likely that the tissue ... is a malignant tissue versus a nonmalignant tissue," she replied "yes," and that her recommendation had been that the lesion "should be completely re-

---

1. These specimens had been obtained by Dr. Frank Triana, the dermatologist who first saw Mrs. Lawson, in November of 1993.

moved." Dr. Olding relied on her opinion as one of the "building blocks" of his diagnosis.

Near the end of the defense case, the Lawsons' counsel told the court that he would be calling in rebuttal Dr. Walter Hoffman, a forensic pathologist, to counteract Dr. Williams' testimony that the lesion was more likely than not cancerous. Specifically, counsel represented that in her deposition Dr. Williams had expressed no opinion on probable cancer or not, "basically never [drawing] a conclusion [as] between one of the three" possible causes of the lesion, but that "[n]ow she has [done so] on the stand." Counsel for GWU disputed whether this would be proper rebuttal, pointing out that Dr. Williams had simply not been asked in deposition "which one is more likely so," and that at most any disparity between her deposition and trial testimony was a matter for impeachment, not a proper basis for rebuttal testimony. The trial judge, noting that Dr. Williams "did at least arguably give a more definitive diagnosis with respect to the pathological sample being squamous cell carcinoma at trial as opposed to [at] deposition," ruled that the rebuttal would be proper.

Later, during the discussion of jury instructions, the Lawsons' counsel further explained his position, stating that Dr. Hoffman's testimony in rebuttal would address the "new issue[ ]" of whether Dr. Williams' diagnosis of cancer was itself "within the standards of [reasonable] care" or instead negligent. The trial court and GWU's counsel expressed surprise, both indicating that they had "thought the only issue to be decided was whether or not the amputation under [Dr. Olding's] decisionary process [constituted the exercise of reasonable care]." The Lawsons' counsel again cited Dr. Olding's reliance on Dr. Williams' diagnosis and asserted that if that diagnosis "was incorrect, meaning that [Dr. Olding] was given ... incorrect information below the standards of care," the jury should be allowed to find GWU liable "independent[ly] of Dr. Olding" for the negligence of Dr. Williams. When the court asked if GWU's counsel had "anything further [to say] as to that," counsel answered, "No, sir." The court concluded that Lawson would be permitted to "pursue that theory."

Dr. Hoffman testified that if the pathology diagnosis given Dr. Olding was that the tissue specimen was more likely than not cancerous, that diagnosis itself was a breach of the standard of due care. At the close of the case, the trial court instructed the jury that GWU would be liable either if it found Dr. Olding liable or if, "independently of anything that Dr. Olding may have done," it found that Dr. Williams had negligently "misinformed Dr. Olding." The court gave the jury a verdict form differentiating liability in this manner, though Dr. Williams' name (without objection) did not appear on the form. In returning a verdict, the jury expressly stated that Dr. Olding and GWU were each liable.

The jury awarded Mrs. Lawson $2,750,000 and Mr. Lawson $200,000 for loss of consortium. The defendants then moved for a new trial primarily on the ground that the damage award was excessive. No challenge was made to the rebuttal testimony of Dr. Hoffman or the jury's having been allowed to predicate GWU's liability on a finding of negligence by Dr. Williams. In a written memorandum order, the trial court granted the motion "unless plaintiffs accept a remittitur to reduce the awards to $1 million and $35,000 respectively," concluding that any damage award beyond those amounts would be "beyond all reason" and "shock the court's conscience."

## II. Discussion

### A. *The Rebuttal*

█ In its primary contention on appeal, GWU argues that the jury's "runaway" verdict stemmed from the trial court's erroneous decision to let Dr. Hoffman advance the theory of Dr. Williams' negligence for the first time on rebuttal.

GWU does not dispute that the complaint alleged, as an alternative ground for its liability, the "negligent evaluation and recording of the pathology specimen of November 16, 1993 [by Dr. Triana] as demonstrating squamous cell carcinoma." Nor does it dispute that the Lawsons' expert witness statement filed under Super. Ct. Civ. R. 26(b)(4) named Dr. Hoffman and stated that he was expected to "render the opinion that any communication by a pathologist or another employee [of GWU] with the surgeon leading the surgeon to believe that there was cancer or a high likelihood of cancer in Mrs. Lawson's finger would have been a violation of the standard of care." Dr. Hoffman was even named to the jury panel at voir dire as a potential witness for the Lawsons. GWU contends, nevertheless, that from the Lawsons' opening statement through nearly the entire defense case, the Lawsons maintained only that Dr. Olding was negligent in amputating without a definitive determination—including by in-surgery frozen section analyses—that the finger was cancerous. No expert called by the Lawsons in their case in chief made mention of any wrongdoing by Dr. Williams. GWU argues that if the Lawsons intended to assert the alternative theory of a misdiagnosis by Dr. Williams, they should have presented Dr. Hoffman in their own case instead of waiting until rebuttal and depriving GWU of (among other things) the ability to call defense witnesses attacking Dr. Hoffman's claims. This prejudice, GWU says, was compounded by the confusion the jury inevitably experienced in seeing what the court had termed a single, "straightforward" issue of liability converted into a two-part theory—one that surprised the trial court itself—virtually on the eve of jury deliberations.

▪ The trial court has "considerable discretion" in deciding whether to admit testimony in rebuttal. *Adkins v. Morton,* 494 A.2d 652, 663 (D.C.1985); *see generally Cahan v. Cokas,* 181 A.2d 342 (D.C.

1962) ("The trial judge has wide discretion in respect to the order of proof."). That discretion, of course, must be exercised in keeping with the purposes of rebuttal. Certainly "[a] change in litigation strategy is not normally permitted on rebuttal," *Allen v. Prince George's County,* 737 F.2d 1299, 1305 (4th Cir.1984), nor is rebuttal "an opportunity for the correction of any oversights in the plaintiff's case-in-chief." *Step–Saver Data Sys., Inc. v. Wyse Tech.,* 752 F.Supp. 181, 193 (D.C.Pa.1990), *aff'd and rev'd on other grounds,* 939 F.2d 91 (3d Cir.1991); *see Brennan v. Jones,* 176 A.2d 877, 878 (D.C.1962) (sustaining exclusion "as rebuttal testimony [of] that which should have been introduced by the plaintiff in his case in chief"). Moreover, "if [proffered rebuttal] testimony would be cumulative of the case in chief, the trial court may disallow it as surplusage." *Cooper v. Safeway Stores, Inc.,* 629 A.2d 31, 35 (D.C. 1993). On the other hand, if testimony is intended to "me[e]t something new, which was brought out by the defendant, and which could not have been anticipated by the plaintiff," it falls "clearly within the rule governing the admission of rebuttal testimony." *Berry v. Littlefield, Alvord & Co.,* 54 App. D.C. 195, 196, 296 F. 285, 286 (1924). The dual requirement that the rebuttal meet "something new" that could not have been anticipated serves both to ensure the orderly presentation of proof and to prevent "the most common—and most detrimental—type of surprise[ ] [which arises] where one party seeks to infuse new issues or defenses into the litigation." *Habtu v. Woldemichael,* 694 A.2d 846, 849 n. 4 (D.C.1997).

In our judgment, the Lawsons should have anticipated Dr. Williams' opinion at trial expressed in probabilities, and permitting them to attack that opinion for the first time in rebuttal as a separate ground of GWU's negligence was a misuse of the rebuttal procedure. The theory of negligence by the dermatopathologist (as distinct from the surgeon) was available to the plaintiffs from early on, since Dr. Hoffman, whom they listed in their Rule 26(b)(4) statement, held the view that the

slides Dr. Williams analyzed not only did not show cancer as a matter of likelihood but revealed "*no* evidence of cancer" (emphasis added). The Lawsons argue that Dr. Williams equivocated in her deposition, expressing inability to state whether any of "the three possibilities in [her] differential diagnosis" was "the more likely etiology" or causal agent. But Dr. Williams was explicit that one of the three possibilities was squamous cell carcinoma and that the second, keratoacanthoma, is commonly viewed as "a type of squamous cell cancer"; she therefore had told Dr. Olding that "we really need to make sure the tumor is gone." As GWU points out, the fact that the plaintiffs never asked Dr. Williams at deposition whether she could state her opinion in terms of probability is no substitute for a showing that they "met something new" when she testified at trial, *Berry, supra,* and so were justified in injecting a new theory of negligence on rebuttal.

■ However, although the trial court erred in allowing the Lawsons to introduce the theory of Dr. Williams' negligence belatedly, we still must determine whether GWU was prejudiced by the ruling enough to warrant reversal. *See Johnson v. United States,* 398 A.2d 354 (D.C.1979) (abuse of discretion requires both error and a determination of significant prejudice from the error). We are not convinced that GWU suffered the required harm. To begin with, Dr. Hoffman's testimony did not come as a total surprise to the defense. As indicated, he was named in the Rule 26(b)(4) statement and his opinion was summarized there. He was not withdrawn as a proposed witness thereafter; indeed, he was introduced to the jury on voir dire. The fact that the Lawsons' experts in their main case did not question Dr. Williams' diagnosis could not have left the defense oblivious to the possibility of counterattack if she took the stand and—in the trial court's words—gave "a more definitive diagnosis [than at deposition] with respect to the pathological sample being squamous cell carcinoma." At no time did GWU explain to the trial court how Dr. Hoffman's belated testimony deprived it of the ability to establish the soundness of Dr. Williams' opinion. It likewise did not explain—and does not explain on appeal—how his opinion compromised the defense that it offered on Dr. Olding's behalf.[2]

■ More importantly, GWU's argument for prejudice depends on the realistic possibility that the jury found it liable based on Dr. Williams' conduct rather than Dr. Olding's. We find no such possibility on this record. The verdict form asked the jury expressly to decide whether Dr. Olding was liable; the trial court instructed it twice that "if you find against Dr. Olding, you should also find against George Washington University"; and the jury found both defendants liable. GWU argues that despite the verdict against Dr. Olding (in turn necessitating a verdict against GWU) the jury might have predicated its verdict against the hospital at least partly on Dr. Williams' negligence, since the court instructed that the plaintiffs' were seeking to hold GWU liable for her fault "independently of anything that Dr. Olding may have done." But, assuming as we must that the jury followed the instructions given it, *see Richardson v. Marsh,* 481 U.S. 200, 206, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), this seems quite implausible given the verdict against Dr. Olding and the explicit instruction it received to hold GWU liable for any negligence of his.

■ Furthermore, we have held that a defendant who does not request a special verdict in a civil case will generally be barred from complaining on appeal about the uncertainty of the verdict rendered. *Nimetz v. Cappadona,* 596 A.2d 603, 606–

**2.** Indeed, after objecting to the Lawsons' announced intention to call Dr. Hoffman in rebuttal, GWU's counsel was conspicuously silent during the discussion of jury instructions when the Lawsons sought to have the jury instructed on GWU's potential liability independently of Dr. Olding—this even though Dr. Hoffman had not testified yet and broached the theory of Dr. Williams' negligence.

08 (D.C.1991); *see also Newell v. District of Columbia,* 741 A.2d 28, 33–34 (D.C. 1999). GWU's counsel did not request that the verdict form address Dr. Williams' liability specifically, even though doing so would have mooted the present issue if the jury found Dr. Olding liable but not Dr. Williams. The "mere theoretical possibility that the jury based its decision" on one theory of negligence rather than the other, *Nimetz,* 596 A.2d at 607 (citation and internal quotation marks omitted), is not basis enough to call its verdict into question.

Finally, although GWU attempts to portray the trial as though the issue of Dr. Olding's liability had receded into the background by the time the case reached the jury (upstaged by the new claim of Dr. Williams' negligence), that was decidedly not so. The Lawsons' closing argument dwelt only briefly on Dr. Williams' conduct and vigorously attacked Dr. Olding's decision to amputate without waiting for confirmation that the finger was cancerous.[3]

■■■ Altogether, the verdict form, the evidence, and the closing arguments give us no reason to doubt that the jury's finding of liability of GWU followed directly from its verdict as to Dr. Olding. We therefore decline to reverse the judgment on the basis of the disputed rebuttal.[4]

## B. *The Remittitur*

### 1. *Background*

As related at the beginning, the jury awarded Mrs. Lawson $2,750,000 in dam-

---

3. [W]e know if Dr. Olding had stopped during the frozen section, there was no cancer, and at the end, of course, there was no cancer again.

 Dr. Olding acts as though this is very surprising to him.... Well, you saw the frozen section. On the 9th before he took the finger off, he just had to wait for that pathologist to come into the room and say what have you got? I got no cancer here. All right, I'm stopping.

 * * * * * *

 The frozen section comes back, it says no cancer, you wait. You sit and you wait, and you take some more tissue if you have to, but you don't go and amputate a finger.

 * * * * * *

 [Y]ou heard [GWU's counsel] say this is cancer and that cancer was grinding into the bone, and ... this, you know, this reminds me of if somebody pulls a fire alarm because they smell what smells like smoke.... Well, Dr. Williams pulled the fire alarm. She said the word[s] "may be cancer." So everybody began to panic, that circle of confusion, the people were all wondering what was going on. And in walks the fire marshal, Dr. Olding. And what does he do? Well, you would think he would send his men into the fire, say, look, check to see if there is a fire, see what's going on in there. And then wait until they come back, like the frozen section, wait till it comes back before you do some permanent damage. Don't tear the house down .... So what did Dr. Olding do? Tore the house down, smashed the windows, bashed at the pieces, and then the guys came out

 and said there's no fire in there.... It's nice today that he conveniently says he did frozen sections because he's just trying to make sure. Right. He didn't do them. As [GWU's counsel] said, he didn't do them to see if there was cancer, he did them afterwards, and that's where he violated the standard of care.

4. Partly for the same reasons, we reject GWU's claim that reversal is necessary because Dr. Hoffman's testimony failed to establish the applicable standard of care with respect to Dr. Williams' diagnosis. Moreover, we find no deficiency in his statement of the relevant standard. *See, e.g., District of Columbia v. Watkins,* 684 A.2d 395, 402 (D.C. 1996).

 We likewise are unpersuaded by GWU's separate argument that the record furnished no evidentiary foundation for the "special susceptibility" instruction which the trial court gave. *See* Standardized Civil Jury Instructions for the District of Columbia, No. 13–8 (1998 rev. ed.). Although not in abundance, there was testimony permitting the jury to find something of a predisposition to emotional injury on Mrs. Lawson's part in that she had been exposed to DES (and thus the risk of cancer) during gestation.

 Finally, contrary to GWU's argument, the trial court's refusal to allow cross-examination of the Lawsons' economic expert about a reprimand he had received from a trial judge in an unrelated case was well within the court's exercise of discretion to exclude such collateral matters. *See Kane v. Ryan,* 596 A.2d 562, 567–68 (D.C.1991).

ages and her husband $200,000 for loss of consortium. The trial court granted GWU's motion for a new trial unless the Lawsons accepted a remittitur reducing the awards to $1 million and $35,000 respectively. The court concluded that the damage awards were "beyond all reason," that any award to Mrs. Lawson beyond $1 million "would shock the court's conscience," and that $35,000 was "the outer limit" the court could sustain for loss of consortium on the record of this case. In reaching these conclusions, the court summarized the evidence and explained its reasoning as follows:

Ms. Lawson went to see defendant Dr. Olding ... with a small but very aggressive growth by the nail of her right ring finger. While the nature of the growth was not entirely clear all medical experts agreed that the tissue had to be removed. Dr. Olding, with plaintiffs' consent, chose to remove the tissue by amputating the distal phalanx portion of Ms. Lawson's right ring finger. The jury heard testimony from which it could and did conclude that surgery less invasive than amputation should have sufficed to remove the growth although the less invasive surgery would also have left Ms. Lawson's ring finger with a less than normal appearance. The aftermath of the amputation also created tendon problems in Ms. Lawson's two adjoining fingers which subsequent surgery has been unable to resolve, leaving Ms. Lawson with limited use and flexibility of three of her fingers.

As to damages, plaintiff incurred medical expenses of approximately $11,000 and put on expert witnesses who testified that this 34 year old woman would never be able to do any work of any kind thus losing $486,000 of income over the course of her otherwise expected working life; would need extensive psychotherapy to help alleviate her emotional turmoil, anxiety, and sense of loss at a cost of $60,562; and would be unable to be of any real help in doing household chores, a loss calculated at $196,356 for help around the house—a total of $753,918 in special damages.

As indicated earlier, the jury returned a general verdict. While defendants put on no damage witnesses of their own they did cross-examine plaintiff's witnesses. For example, Ms. Lawson asked the jury to award close to $200,000 in damages to compensate for the loss of her household services but presented no evidence that *anything* had been spent for that purpose in the two and one-half years since her surgery. Similarly, while the damage done to the mobility of Ms. Lawson's three fingers may well have made it difficult or impossible to do her usual work at a computer keyboard, it is difficult to credit that Ms. Lawson's response to the surgery left her so incapacitated as to be unable to perform any gainful work or household chores for the next quarter century of her life.

Even if all of the claimed special damages are unblinkingly accepted as within the generously expansive province of a munificent jury—and this the court cannot do—[1] the jury still awarded close to $2 million in pain and suffering to a highly anxious woman who had some past physical pain, but currently is in no significant physical pain and is afflicted with feelings of emptiness and loss that has led her to shy away from intimacy.

A court does not lightly upset a jury's verdict. In determining whether a verdict is excessive, the trial court must consider whether the verdict is beyond all reason or is so great as to shock the conscience. In this instance, the court concludes that the jury has exceeded the outer bounds of reasonableness both in awarding $2,750,000 to Ms. Lawson and in awarding $200,000 to her husband for loss of consortium. Any award beyond a total of $1 million for Ms. Lawson would shock the court's conscience. As to the award for loss of consortium, $35,000 is the outer limit this court can

accept especially considering there was no testimony from Mr. Lawson as to the impact his wife's injury had on their relationship.

1. A reduction to no more than $650,000 is plainly warranted.

### 2. *Discussion*

 The trial court may grant a new trial subject to a remittitur if the verdict "is so large that 'it is beyond all reason or is so great as to shock the conscience.'" *Sigal Construction Corp. v. Stanbury,* 586 A.2d 1204, 1220 (D.C.1991). As this standard implies, "[o]ur own decisions, and hence the conduct of judges in the Superior Court, reflect[ ] a[n] ... unwillingness to interfere with the jury's calculation of damages" unless there is "firm support in the record" for such action. *Finkelstein v. District of Columbia,* 593 A.2d 591, 595, 596 (D.C.1991) (en banc) (citations and internal quotation marks omitted). Once the trial court has set a damage award aside and stated its reasons, however, this court will "accord great deference" to that decision. *Id.* (citations and internal quotation marks omitted).

> [G]iven both the traditional self-restraint exercised by trial courts in this area and the trial judge's unique opportunity to consider the evidence in the living courtroom context, we have followed the rule—and we do so today—that we will reverse the grant of a new trial for excessive verdict only where the quantum of damages found by the jury was *clearly* within the maximum limit of a reasonable range. Every doubt on that score will be resolved in the trial court's favor.

*Id.* (emphasis in original; citations, quotation marks, and footnotes omitted). *See also Louison v. Crockett,* 546 A.2d 400, 403 (D.C.1988); *Lacy v. District of Columbia,* 408 A.2d 985, 988–89 (D.C.1979).

 As the trial court's analysis reveals, it found the size of the damage award to Mrs. Lawson unjustified in two primary respects: first, insofar as it appeared to rest on Mrs. Lawson's assertion that "her response to the surgery left her so incapacitated as to be unable to perform any gainful work or household chores for the next quarter century of her life"; and second, in that it awarded her pain and suffering—close to $2 million worth—well out of proportion to the permanent physical and emotional injuries she suffered from the amputation. Admittedly an amputation of any kind is a severe injury, but, as the trial court pointed out, the evidence was that even less invasive surgery would have left Mrs. Lawson's ring finger with an abnormal appearance. Admittedly also, Mrs. Lawson claimed that now, two and a half years after the surgery, she was still so debilitated and depressed by the experience that she essentially could not function, but the trial court was not barred from asking whether the jury could reasonably credit that assertion or, rather, in doing so was swayed by passion or other impermissible factors. *See, e.g., Louison,* 546 A.2d at 403 (in considering motion to strike verdict as excessive, trial court must consider whether verdict resulted from passion, prejudice, mistake, or other improper elements). The trial court found the evidence of lasting injuries insufficient to justify a verdict more than four times the size of the special damages Ms. Lawson had reasonably incurred. Resolving in favor of that judgment any doubt we might have on whether "the quantum of damages was *clearly* within the maximum limit" of reasonableness, *Finkelstein, supra,* we have no basis on which to set aside the trial court's decision.[5]

Accordingly, the judgment of the Superior Court is affirmed in all respects.

*So ordered.*

---

5. Applying the same standard, we cannot say that the proportionately somewhat greater reduction of the award for loss of consortium was an abuse of discretion, particularly given the absence of testimony by Mr. Lawson on the subject.